ARKADELPHIA ELECTRIC LIGHT COMPANY *v.* ARKADELPHIA.

Opinion delivered May 1, 1911.

1. MUNICIPAL CORPORATIONS—RIGHT TO FIX RATES FOR ELECTRICITY.—The fact that a city for valuable consideration in 1904 granted to an electric light company the right to charge certain rates for electricity will not bind the city nor prevent the city council from thereafter fixing such rates as it may deem to be reasonable, as the act of April 21, 1903, authorizing cities and towns to fix such prices to be paid for electricity "as they may deem to be a reasonable charge," constitutes a part of all such contracts entered into after its passage. (Page 186.)

2. SAME—PRESUMPTION IN FAVOR OF ORDINANCE FIXING RATES FOR ELECTRICITY.—Where a city had authority to fix rates for electricity, and did so, the presumption is that the rates so fixed are reasonable, and the burden is upon one who complains of such rates as unreasonable to show affirmatively that they are such. (Page 186.)

3. SAME—RATES—REASONABLENESS.—Where an electric company invested part of its capital in an electrical supply business, and the compensation of its employees engaged in such business was charged against the income derived from sale of electricity to its customers, the profits from this branch of the business should be considered in determining the reasonableness of rates for electricity fixed by ordinance. (Page 187.)

4. SAME—RATES—REASONABLENESS.—Rates for electricity fixed by ordinance can not be held unreasonable where, after 10 per cent. of the value of the plant is set aside for repairs and renewal, the company is able to pay a dividend of from 6 to 10 per cent. on the capital invested. (Page 187.)

5. SAME—PRESUMPTION IN FAVOR OF ORDINANCE—BURDEN OF PROOF.—An allegation that a rate fixed by a city for electricity to be charged by an electric light company is unreasonable and confiscatory is not supported unless the unreasonableness of the rate is established by evidence that is clear, convincing and unequivocal. (Page 188.)

Appeal from Clark Chancery Court; *James D. Shaver*, Chancellor; affirmed.

STATEMENT BY THE COURT.

This suit is by appellant, hereafter called the Company, against appellee, called the City, to enjoin the enforcement of an ordinance of the City, fixing rates to be charged by the Company for electricity furnished consumers.

The rates fixed by the City in said ordinance and required to be applied by the company are challenged as unreasonable

and unjust to the Company and its consumers, and in violation of established methods of rate-making, and confiscatory, in that they deprive the Company of a reasonable return upon its capital invested, and operate to take from it its property without just compensation, in violation of both the Federal and State constitutions. The Company further contended that said ordinance of January 4, 1909, fixing the rates, impaired its contract entered into with the City in August, 1904, and was in violation of the Constitution on that account.

The City answered, admitting the making of the ordinance of August 15, 1904, granting the predecessor of the Company the right and privilege of supplying electricity to the inhabitants of the City; denied "that the rates fixed by the ordinance are unreasonable or in violation of established methods of rate-making, that the ordinance does not allow discounts, and * * * that it entails a loss upon the Company's business, and that it greatly tends to reduce the Company's net revenue, and that the ordinance will cause any of the Company's customers to decline further service or deter prospective customers from installing lights, but alleges that it will cause new customers, and prevent the Company from increasing the rate to other customers at its pleasure; denied that the ordinance rates are confiscatory, and that they deny the Company and its stockholders a reasonable return upon the capital invested, and all other material allegations to the complaint.

The testimony tended to show that by the ordinance of August 15, 1904, the City granted the predecessor of the Company and its successors the right and privilege of supplying electric lights to the city and its inhabitants for a term of thirty years from the passage of the ordinance.

That ordinance provides (section 6) that "the maximum rate to be charged by the grantee to consumers for lights shall be based upon meter rates of 20 cents per thousand watts, and that if any customer becomes dissatisfied with flat rate based upon the above consumption they may demand metered service, according to the rules and regulations of the grantee, provided, however, that in no case shall metered current be furnished at a less rate than $1.50 per month for each consumer so furnished."

The corporation under this ordinance adopted and enforced

a schedule of charges and discounts, the basic price for electric energy being fixed at 15 cents per thousand watt hours, on all meter bills, with a sliding scale of discounts, in consideration of payment on or before the 5th of the month "on a consumption for 16 c. p., one lamp equivalent, of less than 3,500 watts, one month, 10 per cent.," and on up to "on a consumption 16 c. p., one lamp equivalent to 15,000 watts and over, one month 60 per cent., the discount to be arrived at by dividing the watt hours consumed by the number of c. p. lamps connected, or their equivalent, and referring to the discount list.

On January 4, 1909, the City, upon complaint duly made, passed an ordinance fixing the rates to be charged by the Company for electricity furnished to the consumers as follows:

Section 1 provides: Meter rates for electricity consumed per month for 10,000 watt hours or less, $1.50.

For 10,000 to 20,000 watt hours, 14 cents per thousand watts.

For 20,000 to 25,000 watt hours, 13 cents per thousand watts.

For 25,000 to 30,000 watt hours, 12 cents per thousand watts.

For 30,000 to 35,000 watt hours, $11\frac{3}{4}$ cents per thousand watts.

For 25,000 to 40,000 watt hours, $11\frac{1}{2}$ cents per thousand.

And a graduated scale of reduction in price per thousand watt hours as the number of watt hours increased over said amounts, up to 800,000 and over per month, the price fixed thereon being $8\frac{1}{2}$ per thousand watts. The minimum rate was fixed at $1.50.

Section 2 of the ordinance required the Company to accept and adopt the rates, and section 3 made its refusal to do so and charge of a greater amount than that fixed by section 1 a misdemeanor, punishable by fine.

About September, 1908, the Company purchased the franchise granted its predecessor under the ordinance of 1904. It is incorporated for $25,000, of which amount $20,000 was paid in, and it claims that the property purchased from its predecessor was worth in cash $20,000; that an inventory was taken in February, 1907, showing the value of the property as $34,563.75, as stated by its president; that at the time of its sale $14,563 was charged off for depreciation, leaving the $20,000 at which the plant was purchased. He also stated that "the net

cash value of the Company's income for the year referred to will not enable it to put aside for renewal the annual 10 per cent. required and to pay 6 per cent. interest upon the capital invested in the plant."

The Company engaged in the sale of merchandise, fixtures, lamps, wiring contracts, etc., and made a profit of $1,400 on this business. About $500 of its capital was invested in this stock, and the salaries and wages of employees engaged in this department were charged against the revenue derived from the rates charged consumers for electricity.

He made a statement showing the difference between the Company rates and the City rates from January to May, 1909, inclusive, which shows $3,487.20 gross collected under the city rate, when under the Company rate there should have been collected $3,682.80, a difference of $195.60 in five months claimed to be a loss to the company; that if the ordinance had not been passed the rates of the Company would not under its own rates have paid the current and fixed charges, the 10 per cent. to be set aside for repairs, renewals and replacement, and 6 per cent. on the capital actually invested in the electric light plant; that the prices charged by the Company prior to the passage of the ordinance were unreasonable, "in that they were too low and were adopted as an experiment which failed to pay a reasonable amount for depreciation and a fair rate of interest."

"I consider the ordinance rates unreasonable, first, because too low to provide sufficient revenue to meet current expenses, set aside a reasonable amount for depreciation, and pay a fair dividend.

"Second, because they are based upon rules contrary to the best established rules of rate-making, and are so low that the company is unable to allow discounts, and because thereof has more expense in collecting its accounts."

It has a contract with the Arkadelphia Milling Company, by which power is furnished at a certain rate of the gross amount received from the consumers, with the minimum fixed at not less than $250 per month.

The value of the entire property upon which Company is entitled to a return is $16,000, according to the president's esti-

mate and inventory, and it was assessed for taxes at that value, and paid taxes on one-half the estimate.

Another witness, Mr. Dempsey, in charge of the entire electrical department of the Arkadelphia Milling Company that furnished the Company power, made an inventory of its property and testified that it amounted to $11,045.58.

Prof. Gladson, an expert, examined the inventory made by the Company in 1907, and stated that $14,961 would buy the property and pay for all costs of labor used in installation of the plant.

Prof. Burr said that a new plant, including machinery for motive power of the same capacity of the Company's plant could be constructed for $15,000.

The net revenue for the year ending September 1, 1909, after deducting all expenses, taxes and depreciation for scrip, amounted to $1,803.89, not including the $1,400 that the Company made by the sale of its merchandise and wiring of houses.

J. W. Bunch, one of the aldermen who investigated the rates before the passage of the ordinance, stated that, before it was passed by the council, he examined the rates as applied in more than 20 towns in Arkansas, and there was not a town that had sliding rates like the Company that discriminated between its customers. He stated that the Company gave him a report of the revenue and expenditures from December, 1907, to October, 1908, and since the passage of the ordinance he had compared the rates fixed by it during the like number of months in a year previous to the passage of it.

Beginning January, 1908, for eight months, statement shows $4,435.72 under the Company's rate. In 1909, after the City rates went into effect, eight months showed $5,117.32, making an increase of $681.60, and it was stated that the Company got more new patrons in the last six months under the City's rates than it had before under its own.

The Company's contention was, and its experts claimed, that the City rates were not fixed on a scientific and correct basis, that they did not take into account the size of the installation of the customer, the number of lights burned, but only the

amount of electricity actually consumed, and that this was un-reasonable because it required greater expense to be ready to serve consumers with large installations who might not in fact use as much electricity as those with smaller installation who burned their lights constantly; on the other hand, the City con-tended, and the testimony of its experts tended to show, that the rates were made scientifically, according to the usual method of rate-making by electric lighting companies, and operated uni-formly and justly requiring each customer to pay only for the amount of current and electricity actually consumed by him, with a graduated scale of prices on consumption which allowed the greater consumer to pay the least price per thousand watt hours, as is the custom in all commercial dealings.

Comparisons with the Company's rate, the City's rate and the rates of five other towns within the State were made as follows:

RATE ONE MONTH:

| | Company. | Camden. | Hot Springs. | Fayetteville. | Conway. | Little Rock. | City Ordinance. |
|---|---|---|---|---|---|---|---|
| Henderson College ........ | $48.27 | $25.74 | $38.12 | $32.96 | $38.61 | $32.12 | $40.76 |
| Mrs. McPherson .......... | 21.35 | 17.78 | 15.80 | 16.13 | 17.78 | 14.22 | 16.59 |
| J. W. Patterson Company.. | 26.60 | 22.17 | 19.25 | 22.17 | 22.17 | 15.70 | 20.69 |
| Ouachita College .......... | 48.15 | 25.34 | 40.86 | 31.23 | 37.73 | 33.52 | 39.81 |

In the towns of Camden, Fayetteville, Hot Springs and other towns where the consumer is on a meter there are no sliding scale of rates and discriminating discounts, but each con-sumer pays for the amount of current the meter registers, and the larger the amount the consumer uses and has to pay for, the more discount he is entitled to on his monthly bill.

The chancellor held that the Company's complaint was with-out equity, and dismissed it, and from this decree it appealed.

*J. H. Crawford* and *T. D. Crawford,* for appellant.

1. The finding of the city council that the appellant's rates were exorbitant is not conclusive upon the courts. Their rea-sonableness is a matter for judicial determination. 211 U. S.

210; 169 U. S. 466, 527; 72 Fed. 818. The rates made by appellant were based upon the theory that the customer using the greater amount of electricity in proportion to his installation should be favored in the discount received. It favors the class of customers who were the least expense to the producer, and it tended to relieve the load on the plant. This was just and reasonable, and the soundness of the principle has been recognized by this court. 91 Ark. 89, 92; 60 N. Y. Supp. 559; 126 N. Y. App. Div. 371; 152 Mich. 654; 140 Mo. 419. It is only where exorbitant rates are being charged that the city council can interfere to fix rates. The statute does not confer that right upon the ground of discriminatory rates maintained by the company. Kirby's Digest, § 5445.

2. The rate ordinance is void. It deprives the company of its property without due process of law, in that the effect of the rate fixed is to leave the company with a revenue insufficient to pay its operating expenses, maintain its plant and pay its stockholders a reasonable interest upon their investment. Art. 2, § 22, Const. Ark.; 14th Amendment, U. S. Const.; 209 U. S. 123; 164 U. S. 578; 156 U. S. 649, 657; 169 U. S. 466; 212 U. S. 1, 13; 212 U. S. 19, 41, 48; 165 Fed. 667, 678, 692; 134 U. S. 418, 458; 179 Pa. St. 231, 36 L. R. A. 260; 89 Fed. 274.

3. The ordinance is void as impairing the obligation of the city's contract with appellant. 72 Am. Dec. 730; 115 U. S. 650; 172 U. S. 1, 9; 103 Fed. 111; 177 U. S. 559; 115 U. S. 674; 72 Fed. 818, 829; *Id.* 952; *Id.* 829; 71 Fed. 610; 14 Am. & Eng. Enc. of L. 927, 928; 142 Ind. 538; Thornton, Oil & Gas, § 394; 209 Pa. St. 166; 93 Fed. 513; 118 Mich. 314; 154 U. S. 362; 206 U. S. 496; 184 U. S. 368, 382; 215 U. S. 417.

On the question as to the reserved power to alter or amend charters, see Morawetz, Priv. Corp, § § 1097, 1101a; 95 U. S. 324. A right reserved to the State to alter, revoke or annul a corporate charter would not authorize the State to violate its contract with the corporation where the State has not attempted to alter, revoke or annul its charter. But while the Constitution impowers the General Assembly to exercise the power to alter, revoke, etc., it has not authorized municipalities to exercise any such power. The contrast between city and appellant's predecessor is collateral to the grant of the charter, and is not

within the power to alter or annul the charter. 72 Fed. 954; 148 U. S. 344; Spelling, Priv. Corp., § 1028; 202 U. S. 458, 465. See also 180 U. S. 617; 206 U. S. 510, 515; 14 S. W. 974; 111 N. Y. 1; 43 Mich. 140; 70 Ark. 300. The court erred in holding that the profits of appellant's electrical supply business could be considered in estimating the profits of appellant from the lighting business. The city was not impowered to regulate the supply business. *Smyth* v. *Ames,* 169 U. S. 540. Fixing rates in a charter is a specification of what is reasonable. 62 Miss 107; 206 U. S. 511; 115 U. S. 670.

*McMillan & McMillan,* for appellee.

1. The rates or charges that the appellant was making to some of the citizens were unjust, unreasonable and discriminatory, and for this reason after an investigation as required by statute, Kirby's Dig., § § 5445-5447. The ordinance now attacked was passed by the city council. It is the duty of the Company to furnish with the electricity, etc., upon terms and conditions common to all and without discrimination. 89 Am. St. Rep. 345; 120 N. W. 966.

2. The ordinance was passed under authority of the "act to authorize the city council of cities and towns to fix or regulate the price to be paid for water supply, gas or electricity." Kirby's Dig., § § 5445, 5446, 5447. The requirements of this statute must be read into every contract entered into after its enactment. 80 Ark. 128. And that the city council has authority to regulate the rates is not now open to question. 95 Ark. 605; 212 U. S. 378; 120 N. W. 966. Having authority to regulate the rates, and having done so by proper ordinance, the presumption is that they are reasonable, and the burden is upon the appellant to show that they are not reasonable. 60 Ark. 241. Rates sufficient to enable the Company to realize a sum large enough to defray current repairs and expenses and pay a profit on the reasonable cost of building and equipping the plant ought to be reasonable. 60 Ark. 243. Every presumption should be indulged in favor of the constitutionality of the ordinance. 211 U. S. 186; 159 U. S. 380, 382, 40 Law. Ed. 188, 16 Sup. Ct. Rep. 43, 46; 212 U. S. 19; 120 N. W. 966.

3. If the foregoing sections had never been passed by the Legislature, still under section 5443, Kirby's Digest, and the

ordinance granting the franchise to appellant, the council would have the right to fix the rates that the Company could charge the citizens. 80 Ark. 128, 129, 130; 180 U. S. 679.

KIRBY, J., (after stating the facts.)    The city ordinance of 1909 is challenged as being void, because it impairs the obligation of the Company's contract, and fixes such unjust and unreasonable rates as are confiscatory, and deprives the Company of its property without compensation.

The first ordinance granting the franchise to the predecessor of the Company, to which it succeeded, was passed in 1904, after the enactment of sections 5445-5447 of Kirby's Digest (act of April 21, 1903), and this statute, authorizing cities and towns upon complaint filed to examine the rates charged consumers for electricity and determine whether they are reasonable, and "fix such prices to be paid for * * * electricity as they may deem to be a reasonable charge," will be read into every contract to which it relates, made since its enactment. *Lackey* v. *Fayetteville Water Company,* 80 Ark. 128.

The City had the power, under this statute, to examine the Company's rates upon complaint made, and, finding the charges unreasonable, to fix such rates as it deemed reasonable, and the ordinance fixing the rates could not impair the obligation of any contract had with it by the Company or its predecessor made since the passage of the statute.

The rates having been fixed by the city council, which is given authority to investigate and determine reasonable rates, the presumption is that they are reasonable, and the burden of proof is upon the Company to affirmatively show that they are not. *Railway Company* v. *Gill,* 54 Ark. 112.

By act 282 of the Acts of 1905, section 1, all persons and corporations furnishing electricity to consumers in cities of the first and second class, in case meters are furnished to their patrons for measuring such electricity, are required to supply printed tables to them semi-annually, on certain days, showing the price charged per thousand units for such electricity, and by section 2 are required to base their charges upon the reading of said meters and charge for same as per the printed tables furnished; and the bills or statements rendered patrons "shall show the number of units charged for."

*In Little Rock Railway & Electric Co.* v. *Newman,* 91 Ark. 92, the court, construing this act, said: "The manifest design of the act is to provide means whereby the consumer may be informed as to the exact charge for service, and to require uniformity of charges against all customers using like quantities of the commodity. * * * A regulation of the charges for such service should be just to the Company, as well as to all patrons, so as to allow compensation to the former, and reasonable, uniform rates to the latter, according to the amount of the commodity consumed. One class of patrons should not be favored at the expense of another."

Under the proof in this case it appears that by the rates fixed in the ordinance of 1909, and applied by the Company, its gross revenues for nine months show an increase in fact over a like period of time under its voluntary rates amounting to $681.60. Estimating the value of the Company property upon which it is entitled to revenue at $16,000, the net revenue for the year ending September 1, 1909, amounted to $1,803.89, and the profit upon its electrical fixture supply business to $1,400; in all, $3,203.89. This last sum of money was realized from the capital of the Company invested and the labor of its employees paid by and charged to the income derived from the sale of electricity by the Company, and should be estimated in determining the reasonableness of the rates fixed.

The testimony shows that 10 per cent. is not an unreasonable amount to be set aside as a reserve or sinking fund for repairs and replacement, and, deducting that amount ($1,600) from said income, we have left $1,603, or a dividend of 10 per cent. upon the amount invested, which was the dividend one of the directors testified was being paid, and that the Company was also maintaining a reserve. If the value of the capital of the Company be estimated at the full $20,000, which it claimed was the amount of the paid-up stock, although its president could only show the amount of $16,000 by his inventory, after deducting for replacement, there still remains enough to pay a dividend of 6 per cent. While, if the value of the plant was no greater than estimated by Dempsey, after deducting the 10 per cent. for replacement, we have remaining $2,099.39 or a dividend of 19 per cent. The Company is entitled to a reasonable return on

the fair value of its property devoted to the public use.  *Wilcox* v. *Consolidated Gas Co.,* 212 U. S. 19, 53 L. Ed. 398.

The legal rate of interest in this State is 6 per cent., and the contractual rate is 10 per cent., beyond which lenders are not allowed to go in charging for their money, and the Company cannot complain of the rates as unreasonable and confiscatory that provide uniformity of charge for all customers ·in accordance with the amount of the commodity actually ·consumed by each, and permit it to realize in any event more than the legal rate of interest on its investment, and probably the contractual rate· permitted by law, after deducting 10 per cent. as a reserve fund for replacement and renewal of the plant.

Under these rates, the Company is shown to have acquired more new patrons in the same length of time than under its own rates, and to have realized more revenue from the sale of its current to its consumers in acordance therewith than under the rate made by it, and it also provides a uniform rate of charges against all customers using like quantities of the commodity, and we hold that the presumption in favor of the reasonableness of the rates established by the City has not been overcome, and that the Company has failed to show by clear, convincing and unequivocal evidence, as the law requires it to do, that the rates fixed by the City are unreasonable and non-compensatory and effect a taking of its property without just compensation, and its complaint was properly dismissed.  The decree is affirmed.