PORT RICHMOND & BERGEN POINT FERRY CO. v. BOARD OF CHOSEN
FREEHOLDERS OF HUDSON COUNTY.

(District Court, D. New Jersey. March 5, 1920.)

1. **Ferries ⬤⟿31—Court cannot interfere with rates prescribed, unless unreasonable.**

    The court cannot interfere with rates of ferriage prescribed by a county board of chosen freeholders, if they are not unreasonable.

2. **Ferries ⬤⟿31—In determining reasonableness of rates, value determined as of date of inquiry.**

    In determining whether rates of ferriage prescribed by a county board of chosen freeholders are unreasonable, the value of the ferry company's property should be considered and determined. as of the time when the inquiry is made regarding rates.

3. **Ferries ⬤⟿31—Evidence in rate case insufficient to show depreciation items were charged to make a case.**

    In a ferry company's suit to enjoin a county board from enforcing resolutions reducing the rate, evidence *held* insufficient to show that complaint listed depreciation items in the years immediately preceding the institution of the suit, in order to build up for itself a case warranting relief on the ground of confiscation.

4. **Ferries ⬤⟿31—As respects rates, company entitled to set aside amount for depreciation and replacement.**

    As respects the reasonableness of rates of ferriage prescribed by a county board, the ferry company is entitled to set aside something from its gross income to make good depreciation and replacement of parts of its property.

5. **Ferries ⬤⟿31—Rates prescribed held unreasonable, as not allowing fair return.**

    Where a county's own witness fixed the value of the property of a ferry company at $200,000, while the company's witnesses fixed a higher value, and, during the year it complied with resolutions reducing the rates of ferriage, it had a surplus of only $2,790.84, without allowing anything for depreciation, for which it claimed the right to set aside $7,500. the rates prescribed were unreasonable, as requiring the company to operate the ferry at an income not amounting to a reasonable return, if not to an actual loss.

6. **Injunction ⬤⟿113—Ferry company not guilty of laches in enjoining enforcement of resolution fixing rates.**

    Where, soon after the adoption of resolutions by a county board in 1905, reducing rates of ferriage, the ferry company brought an action to test the legality of the resolutions, which was not finally terminated until July, 1914, when the resolutions became effective, and a little over a year later the company sued for an injunction, on the ground that the rates were confiscatory, laches was not chargeable to it.

In Equity. Suit by the Port Richmond & Bergen Point Ferry Company against the Board of Chosen Freeholders of the County of Hudson for an injunction. Preliminary injunction made permanent.

Frank Bergen, of Newark, N. J., for complainant.
John J. Fallon, of Hoboken, N. J., for defendant.

LYNCH, District Judge. The bill in this case alleges that the complainant, a New York corporation, for more than 30 years has maintained and operated a ferry from Port Richmond, in Richmond

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

county, N. Y., to Bergen Point, in Hudson county, N. J.; that the rate charged by the complainant for the carrying of adult passengers on and prior to July 6, 1905, was 5 cents each for a single crossing, which was 1 cent less than the rate for such service authorized by its charter, and 3 cents each for children; that on July 6, 1905, the defendant, under the alleged authority of an act of the Legislature of New Jersey, passed February 6, 1799 (Laws 1703–1800, p. 350), adopted resolutions reducing the rate of ferriage previously charged by the complainant to 3 cents for each adult person and 2 cents for each person under 10 years of age for single crossings, and 6 cents for each adult and 4 cents for each person under 10 years of age for round trips; that shortly after the adoption of said resolutions the complainant began an action in the New Jersey Supreme Court for the purpose of testing the legality thereof, which litigation resulted in a judgment (80 N. J. Law, 614, 77 Atl. 1046) affirming the authority of the defendant to adopt the resolutions; that this judgment, upon writ of error, was affirmed by the Court of Errors and Appeals of New Jersey (82 N. J. Law, 536, 82 Atl. 729), and subsequently by the United States Supreme Court (234 U. S. 317, 34 Sup. Ct. 821, 58 L. Ed. 1330); that upon the final termination of the litigation the resolutions became effective, and on July 8, 1914, the complainant began to comply therewith, and up to the filing of the bill (December 8, 1915) has continued to comply therewith; that for the 12 months ending July 31, 1915, during which period the resolutions were complied with, the gross income of the plaintiff from the operation of its ferry was $54,467.70, and its operating expenses, including taxes and depreciation, amounted to $59,176.95, there being a deficit of $4,709.15, which the complainant attributes to the reduction in the rates for passengers imposed by said resolutions, there being no change in the rates charged and collected for transporting horses, vehicles, and cattle, and other services performed by the complainant; that if the same number of passengers had been carried by the complainant that year, at the rates charged previous to the adoption of the resolutions for passenger carriage, the gross income would have been $73,311.35, instead of $54,467.79, and, instead of there being a deficit, there would have been an earning of $14,114.40; that the value of complainant's property actually and necessarily employed in the operation of its ferry exceeds $300,000, and it will cost more than $400,000 to reproduce the same; that since July 8, 1914, the date when the reduced rate went into effect, the complainant has not earned any income or interest on the value of its property, or even sufficient moneys with which to pay the expense of operating the ferry and maintaining it in suitable condition and to pay the taxes on the same levied by the states of New York and New Jersey and the municipalities in which the terminals are located; that said rates prescribed by the defendant are therefore unjust, unreasonable, and confiscatory; that the enforcement of the rates prescribed by the defendant's resolutions has had and still has the effect of taking the property of the complainant for public use without just compensation, in violation of the Constitution of New Jersey, and the enforcement of

said resolutions has deprived and still deprives the complainant of its ferry property without due process of law, and denies to the complainant equal protection of the laws, and so violates the rights of the complainant secured by the provisions of the United States Constitution. Wherefore the complainant prays that this court issue writ or writs of injunction restraining the defendant from enforcing hereafter, or attempting to enforce, the resolutions reducing fare, or from enforcing either of said resolutions, or from requiring complainant to comply with said resolutions, or from prosecuting any suit against the complainant for any penalty for refusal to comply with said resolutions, or from interfering in any way with the right of the complainant to charge and collect for transporting passengers on its ferry the rates charged by it prior to July 6, 1905.

Attached to the bill is an affidavit by Matthew R. Boylan, auditor of the complainant, from which I quote:

"That during said year ending July 31, 1915, the gross earnings of said company from the operation of said ferry were $54,467.79; that during said year said company paid out for operating expenses, taxes, repairs, and maintenance $51,676.95, and set apart the sum of $7,500 in addition thereto for depreciation; that sum, as deponent believes, was not more than sufficient to provide for the annual depreciation of the property of said company employed in operating said ferry."

And further:

"That the deficit of $4,709.16, referred to above, was caused by the reduction in fares for passengers as prescribed in said resolutions."

There was also attached an affidavit of Henry C. Anderson, professor of mechanical engineering of the University of Michigan, wherein he sets forth that in addition to his occupation as professor he is engaged in making estimates of the value of public utility plants and property, such as railroads and ferry companies, and has been so engaged for fifteen years past; that he made a careful examination and appraisal of the condition and value of the property of the complainant, and also estimated the cost of reproducing the same; that the value of said property as of December 6, 1915, was $302,000, not including overhead charges, franchises, going value, supplies on hand, or working capital; that the cost of reproducing said property new, without overhead charges, franchises, going value, stores, or working capital, would be $435,156; and that at least the sum of $7,500 should have been set aside by the complainant annually out of earnings for depreciation of its property.

On December 8, 1915, Judge Rellstab issued an order requiring the defendant to show cause on December 20, 1915, why a writ of injunction should not issue according to the prayer of the bill, the hearing of which was by consent adjourned to December 27, 1915. On December 27, 1915, James J. Murphy, Esq., entered an appearance as solicitor for the defendant, and on said date, after hearing, Judge Rellstab ordered that a writ of preliminary injunction issue according to the prayer of the bill, which writ of injunction was duly issued and is still in force and effect.

On December 9, 1916, the defendant, through James J. Murphy, Esq., solicitor, filed an answer admitting paragraphs 1 to 6, inclusive, of the bill, setting out that it had no knowledge or information sufficient to form a belief as to the statements in paragraphs 7 and 8 thereof, and denying paragraph 9. On February 27, 1919, the defendant, through John J. Fallon, Esq., substituted solicitor, served upon the complainant notice of an application for an order to dissolve the preliminary injunction granted December 27, 1915, on the ground of inexcusable delay in bringing this cause to a hearing, which notice stated that the records of the court showing the date when the bill of complaint was filed and the date of the granting of the preliminary injunction would be relied upon. On March 4, 1919, Judge Rellstab, by order, denied this motion of the defendant; "the court being of the opinion that there is no merit in the application" therefor.

The trial of the issue was begun before me on Thursday January 15, 1920, over four years after the granting of the preliminary injunction, and the issue to be decided by this court is whether or not the proofs submitted, which relate to the situation existing at and prior to the filing of the pleadings, convince this court that the preliminary injunction should be made permanent. The issue is not framed so as to permit of the consideration of receipts and expenditures subsequent to the filing of the bill.

It probably would be well to state that there is nothing on file in the case indicating that the granting of the preliminary injunction was seriously opposed. It would appear that the court at that time had before it the bill and affidavits of the complainant only. Did the situation at the close of the year ending July 31, 1915, justify the complainant in appealing to this court for an injunction suspending the operation of the lower rates of fare and permitting a restoration of the rates previously charged?

At the trial complainant produced Mr. Richard E. Danforth, mechanical engineer of 29 years' experience in the construction, maintenance, and operation of railways and other utilities, and for 12 years general manager of the Public Service Railway Company, with which company the complainant is affiliated, who testified that he has had the oversight, direction, and management of the ferry of the complainant, and for the past 12 years has been obliged to keep in close touch with the business of the company and the physical condition of its property, to direct needed repairs, reconstruction, and improvements, and prepare estimates and plans for such improvements. Mr. Danforth testified that in his judgment the value of this particular property was in excess of $400,000.

Matthew R. Boylan, auditor of the complainant since 1904, and acquainted with the ferry property for over 28 years, testified with respect to the receipts and expenditures. He produced a compilation showing the earnings and operating expenses for the years ending July 31, 1914, and July 31, 1915; the year ending July 31, 1914, hereafter referred to as the year of 1913–14, being the last year of operation under the old or "5-cent" fare, and the year ending July 31, 1915, hereafter referred to as the year of 1914–15, being the first

full 12-month period or year in which the so-called "3-cent" fare was charged.

During the year of 1914–15, the total revenues were $54,467.79, as compared with $62,263.34 for the previous year of 1913–14; a falling off of $7,795.55. The actual expenditures for the year 1913–14 were $49,803.55, disclosing an operating income of $12,459.79. If the 3-cent fare had been in effect during the year of 1913–14, the gross receipts, instead of being $62,263.34, would have been $46,386.19, resulting in a deficit of $3,417.36, instead of an income of $12,459.79.

The actual operating expenses for the year 1914–15, not including any sum whatever for depreciation of property, were $51,676.95, leaving a net income of $2,790.84. However, the defendant in the year 1914–15 charged up for depreciation the sum of $7,500, which according to the testimony of Mr. Danforth and the affidavit of Prof. Anderson, was not too large a sum to be allowed for that purpose. If $7,500 should be added to the operating expenses cf the year 1914–15, instead of there being a net income that year, there would be a deficit of $4,709.16.

The defendant's position, as I understand it, is not that no sum for depreciation should be allowed for the year 1914–15, but that the complainant should not be permitted to "arbitrarily" charge up $7,500. In the year 1913–14, the year netting $12,459.79, the sum of $6,375 was charged to depreciation. Exclude this charge, and the net income that year would have been $18,834.79. If $6,375 had been charged to depreciation in 1914–15, instead of $7,500, the deficit would have been $3,584.16.

The only witness produced by the defendant was Mr. Mark Wolf, a certified public accountant, who testified from records made by him from the books of the complainant. Mr. Wolf pointed out that for the year of 1913–14 the total maintenance item (including depreciation) was $13,406.51, and for the following year (1914–15) $23,917.49, an increase of $10,510.98. He was asked the following question:

"Q. What does that show as to the depreciation which was set up in 1913–14, as compared with 1914–15? A. It shows that the depreciation set up in 1915 was slightly larger than it was in 1914."

He also pointed out that the maintenance for 1914–15, exclusive of depreciation, is $8,219.31 over 1913–14, about 100 per cent. increase. He analyzes the sums expended for maintenance in the year 1914–15, and concludes that the items were not for ordinary expenses, but were extraordinary expenses of that year, basing his opinion on the fact that the amount of repair work done in previous years, as compared with expenditures in this particular year, comparing one year with another for a series of years, was slight. Mr. Wolf stated that in his opinion the moneys expended for these extraordinary expenses in the year 1914–15 should be charged to that year.

"But they must be considered jointly with the item of depreciation. * * * This question of maintenance brings in depreciation. They are both one and the same matter, you might say, and if you have an extraordinary amount of maintenance in a given year your depreciation would be so much less, because the two items are figured together in the uniform system of accounts as

prescribed by the Public Utility Commission of this state, that in setting up your rule for depreciation, maintenance must be taken into account; that is to say, you set up one lump figure, by adding a lump figure or a percentage of a capital item, which is intended to cover both maintenance and depreciation, and from that figure you are to deduct your actual maintenance, the balance to represent your depreciation."

He added that this principle is also recognized by the federal income tax regulations. He further pointed out that the expenditures for the year of 1914–15, amounting to $16,477.49, were about 2½ times as great as the annual average from 1901 to 1910.

[1] The question before this court is the reasonableness of the rates prescribed by the resolutions of the board of chosen freeholders. The court cannot interfere, if the rates are not unreasonable.

[2] The value of the property should be considered and determined as of the time when the inquiry is made regarding the rates. The defendant quotes the following with which we agree:

"In San Diego Land & Town Co. v. National City, 174 U. S. 739 [19 Sup. Ct. 804, 43 L. Ed. 1154], the court said: 'Judicial interference should never occur, unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use.'"

And also the following:

"In Smyth v. Ames, 169 U. S. 466 [18 Sup. Ct. 418, 42 L. Ed. 819], the court said: 'What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth.'"

This doctrine of the Smyth-Ames Case was quoted with approval in the Minnesota Rate Cases (Simpson et al. v. Shepard, Same v. Kennedy, and Same v. Shillabler, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18), from which the following is quoted:

"The ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment, having its basis in a proper consideration of all relevant facts. The scope of the inquiry was thus broadly described in Smyth v. Ames, 169 U. S. pages 546, 547 [18 Sup. Ct. 434, 42 L. Ed. 819]: 'In order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property, *What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience.* On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth.'"

[3] I cannot find as a fact, as is argued by the defendant, that when the complainant listed depreciation items in the years 1913–14 and 1914–15 it did so "ostensibly because of the litigation which it had instituted against the defendant," in order to build up for itself by

figures a case which would warrant it in applying to this court for injunctive relief on the ground of confiscation, etc. It seems to me that, if deceptive statements were to be relied upon, the "juggling of figures" would have been started years before the year of 1913–14 (in which year, by the way, there was a substantial income and a dividend paid), rather than beginning it the very year that the lower rates were put into effect. During the years that the litigation attacking the validity of the resolutions was in progress, a depreciation, gradually increasing from year to year, could very easily have been built up. This was. not done. The witness Wolf, testifying for the defendant, actually criticized the complainant for. its failure to set aside, previous to the year 1913–14, a fund for depreciation.

[4] In view of the decision of the United States Supreme Court in the case of Knoxville v. Knoxville Water Company, 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371, I do not think it will be seriously contended that this company should not set aside from its gross income some amount for making good the depreciation and replacing parts of its property. The court in that case held that it was not only the right of the company to make such a provision, but its duty in the case of a public service corporation, not only to its bond and stockholders, but also to the public.

[5] Wolf testified that the books of the complainant showed that the cost of the property in the year 1914–15 exceeded $200,000. This sum is approximately one-half of what the witness Danforth testified the value of this property was at that time. Assuming that $200,000 would be a fair valuation of the property for the purpose of basing a rate of income for the year 1914–15, if no sum whatever for depreciation were allowed for that year, there would be a surplus of $2,790.84, making the rate of return less than 1½ per cent. And if, instead of allowing $7,500 for depreciation for that year, the amount should be reduced to $3,000 (less than one-half of the previous year), there would then be a deficit of $209.16. It is clear to me that the putting into effect of the "3-cent" rate required the complainant to operate its ferry at an income so low as to amount to deprivation of a reasonable return, if not at an actual loss.

[6] The defendant further urges that it would be a travesty on justice if the complainant were permitted to delay questioning, by due process of law, an alleged infringement or violation of its constitutional rights for a period of 10 years. It is my opinion that laches should not be charged to this complainant because, as soon as it was finally determined by the courts that the resolutions were valid and binding, they were put into effect, and, as soon as it was ascertained that their operation caused a shortage of return, application for relief was filed. Delay pending other proceedings has frequently been held excusable. See Central Railroad Co. of N. J. v. Mayor, etc., of Jersey City et al. (D. C.) 199 Fed. 245.

A decree making permanent the preliminary injunction will be entered.