FULTON FERRY & BRIDGE COMPANY *v.* HUCKINS.

Opinion delivered March 21, 1927.

1. FERRIES—RATES.—While ferries are established for the accommodation of the public rather than for the gain and advantage of persons operating them, the rates fixed by the county court must be reasonable.

2. FERRIES—RATES—JURY QUESTION.—The reasonableness of ferry rates is a question solely for the courts.

3. FERRIES—REASONABLENESS OF RATES.—Other courts cannot interfere with the rates or tolls of ferries fixed by the county court unless they are unreasonable.

4. FERRIES—REASONABLENESS OF RATES—PRESUMPTION.—The burden is on a party complaining of ferry rates fixed by the county court to show their unreasonableness, the presumption being that they are reasonable.

5. FERRIES—REASONABLENESS OF RATES—VALUE OF PROPERTY.—In fixing ferry rates, the value of the property devoted to public use should be considered and determined as of the time when the inquiry is made regarding the rates.

6. FERRIES—REASONABLENESS OF RATES—LOSSES AND PROFITS.—Past losses cannot be used to enhance the value of the property or to support a claim that rates for the future are confiscatory, nor can past profits be used to sustain confiscatory rates for the future.

7. FERRIES—REASONABLENESS OF RATES.—Consideration of the increased value of a ferry as a going concern since the organiza-

tion of a corporation taking it over for capitalization at a certain figure *held* not warranted in fixing toll rates, where it was a going concern when incorporated, and no circumstances are shown establishing an increase of value.

8. FERRIES—REASONABLENESS OF RATES—RENTAL VALUE.—It was not error, in determining the reasonableness of ferry rates, to exclude from consideration any additional rental value of the ferry franchise since the ferry was incorporated, in view of the official reports of the corporation showing the cost of construction and reproduction.

9. FERRIES—REASONABLENESS OF RATES—COST OF INSURANCE.—The cost of carrying liability insurance was properly excluded where no such insurance was being carried, and no occasion for carrying it was shown.

10. FERRIES—RATES—AMORTIZATION OF PLANT.—In fixing toll rates, a ferry company should have been allowed a yearly amount sufficient to cover the amortization of the plant during the next three years, when it was shown that the ferry would be displaced by a bridge.

11. FERRIES—RATES—EXPENSE OF MAINTENANCE.—In fixing ferry rates, a reasonable amount for emergency work in reconditioning the shifting river bank after overflows for the landings should have been allowed as a necessary expense of operation, though no charge had theretofore been made by the company's president and ferry manager for such work by teams from his plantation.

12. FERRIES—RATES—SUSPENSION OF TRAVEL IN OVERFLOWS.—Suspension of travel because of periodic overflows *held* not so probable as to warrant allowance for loss of tolls thereby.

13. FERRY—FIXING RATES.—In fixing ferry rates it is immaterial that the ferry was paid for out of excessive profits from high toll rates in past years, as the law, in protecting the owner in the enjoyment of the property, does not consider the source of the purchase money, but only its use in rendering service.

14. FERRIES—RATES—EVIDENCE.—Evidence *held* to establish that day ferry rates of 50 cents per automobile and per ton of trucks, instead of 35 cents fixed by the county court, and a night rate of 75 cents for automobiles and per ton of trucks, instead of 70 cents, would be reasonable.

Appeal from Miller Circuit Court; *James H. McCollum,* Judge; reversed.

### STATEMENT BY THE COURT.

This appeal comes from a judgment of the Miller Circuit Court affirming the judgment of the county court

fixing rates of tolls or ferriage for the ferry operated across Red River at Fulton by the Fulton Ferry & Bridge Company.

The ferry company made application to the Miller. County Court, in December, 1925, for license to continue operation of a public ferry at Fulton for the next year, from the expiration of its license on the 31st of December. Paul J. Huckins *et al.* were permitted to intervene as taxpayers and residents of Miller County, using the ferry and paying the tolls, and alleged that the tolls collected by the ferry company were unreasonable and exorbitant, and prayed the court to put into effect reasonable and fair rates of toll for ferries.

The ferry company, on May 6, 1926, wrote the county clerk, inclosing its check in payment for the license and fees, and a schedule of tolls or rates fixed by the county court for former years and rates fixed by the Hempstead County Court for the present year, stating: "While the rates allowed us $1 for crossing a two-horse team and wagon and same amount for crossing an automobile, we do not charge more than 75c for one-way passage and $1 for round trip. Making the rate $1, we are protected from people who load up their automobiles and wagons with foot passengers to avoid paying ferriage. The schedule also gives us a night rate that would give us a chance of coming out on. Will you please explain these matters to the court. Dated May 6. 1926."

This schedule showed:

Automobiles ................................................................$1.00
Trucks (per ton)..........................................................$1.00

The ferry company responded, denying that the tolls set forth in its schedule are unjust, exorbitant or excessive; alleged that they are reasonable, and necessary to allow a reasonable rate on the investment, and similar to those charged by ferries in the State of Arkansas, especially in Miller County, where anything like similar services to those offered by respondent are maintained, and, because of the character of the river banks, the ferry

landing and approaches are unstable and have to be changed from time to time during high waters, causing large expenditures in keeping and maintaining such approaches in a safe condition for operation of the ferry.

The court, on July 12, fixed the license fee, and continued the matter of making rates and fixing schedule of tolls, and, on August 16, found the rates suggested in the schedule of the ferry company excessive and unreasonable, and fixed a schedule of rates for ferriage over Red River for Miller County as follows:

| | |
|---|---|
| Sheep and goats | $0.05 |
| Hogs | .08 |
| Loose cattle | .12 |
| Horses and mules | .10 |
| Persons on foot | .10 |
| Man and horse | .15 |
| Single buggy and horse | .25 |
| 2-horse team and wagon | 35 |
| 4-horse team and wagon | .60 |
| 6-horse team and wagon | 1.00 |
| 8-horse team and wagon | 1.25 |
| Automobiles | .35 |
| Trucks (per ton) | .50 |

"The night rate shall be double the rates above set forth, which are to be collected during the day."

The ferry company appealed from this order, and petitioned the circuit court to suspend the rates fixed by the county court; alleged that they were unreasonable and confiscatory, and prayed that they be permitted to charge, pending the appeal, the same rates as were allowed to be charged for travel from the Hempstead County side of the ferry, showing a schedule the same as that inclosed to the county court with the application for license, in which the rate for automobiles was $1 and trucks (per ton) $1. The important and controlling rate or toll is the rate on automobiles.

The testimony shows that, for more than forty years prior to June, 1922, the Fulton Ferry had been owned

and operated by J. B. Shults of Fulton, or members of his family; that, at that time, he sold a one-half interest in the ferry to the Conways for $15,000. An Arkansas corporation, the Fulton Ferry & Bridge Company, appellant, was organized June 1, 1922, and took over the ferry and its assets, issuing stock therefor to members of the Shults and Conway families in the sum of $30,000.

Later, without additional capital being paid in, the capital of the company was increased from $30,000 to $150,000, and stock issued in that amount. No dividends were ever paid after the stock was increased, all profits being consumed in paying bonds and interest and salaries to the officials of the corporation.

During the spring of 1926 George T. Conway, who had previously sold for $7,500 a fourth interest in the ferry to Joe Chatfield, only delivering him $25,000 in stock therefor, bought it back for $5,000.

In the spring or summer of 1923 George T. Conway and J. B. Shults secured from the county courts of Miller and Hempstead counties franchises to construct a toll bridge across Red River near Fulton, and in November J. B. Shults and George T. Conway, president and vice president of the Fulton Ferry & Bridge Company, sold these franchises, which had been obtained from the county courts of said counties for nothing, to their bridge company for $100,000, themselves being two of the three directors of the corporation, and Brooks Shults, son of the president, J. B. Shults, being the third. No tolls or rates for ferriage had been fixed by the Miller County Court since the formation of the corporation, the schedule as last made by it, April 5, 1922, allowing $1 for automobiles and $1 for trucks (per ton), when Shults owned the ferry, as attached to the petition for the license, was the same as the schedule of rates fixed by the Hempstead County Court, and had been kept posted by the Ferry Company, which was charging 75c for carrying automobiles in the daytime and $1.50 for ferriage at night.

The gross receipts of the ferry for the calendar year 1922, the year prior to the formation of the corporation, were $20,927.09. The appellant's fiscal year ends May 31, and increase of traffic and income is reflected in the gross receipts for the fiscal years since its formation as follows:

Year ending May 31, 1923................................$26,078.60
Year ending May 31, 1924............................. 28,626.64
Year ending May 31, 1925............................. 42,408.87
Year ending May 31, 1926............................. 56,836.56
For five months of the fiscal year that
    will end May 31, 1927, being the
    months of June to October, 1926,
    inclusive ............................................................. 31,013.69

While the income had increased about 300 per cent., rates in effect had not been changed until the present order of the county court. According to exhibits made from appellant's books since its organization, income had been paid out in salaries, dividends, interest on bonds and bonds (those issued for the bridge franchises granted by the county courts as already stated), attorney's fees and expenses of the bridge litigation, to the amount of $122,904.25.

The company kept no capital or depreciation account, but every item of improvement or addition to equipment was charged to the expense account, the same as wages paid the employees of the corporation, and the plant, in cash and usable value, is now worth more than the value at the time it was taken over by the corporation.

This ferry crosses Red River at Fulton on the main highway from St. Louis, north, and Memphis, east, through Little Rock and Texarkana, into Texas, United States Highway No. 67. The ferry at Garland, on the river below Fulton, is on the main highway from Texarkana through the Arkansas oil fields to Pine Bluff. These two ferries have a monopoly of the traffic on these improved roads, and each has been charging 75c ferriage for automobiles. The rates of toll on other ferries on

Red River below the Fulton Ferry, where no good roads have been built at public expense and the traffic is light, are, for crossing automobiles:

Dooley's Ferry................................................................50c
McClure's Ferry..............................................................35c
Nottingham's Ferry..........................................................50c
Blanton's Ferry at Spring Bank..........................................25c

The value of the corporation's property is placed at $30,000 in its exhibit No. 15, and was rated for taxes for the year 1925 at $4,000 value, and the total tax paid by it on all property, real and personal, in Arkansas for the year 1925 was $129.48. On the annual return for the corporation for the year ending January 1, 1926, the value of its personal property was fixed at $15,000 by the secretary, and on the return made to the Arkansas Railroad Commission for the value of the personal property for June 1, 1926, was placed by Brooks Shults, secretary, at $6,000. The total value of all personal property as estimated and appraised by Crawford and McClure, witnesses for appellees, was $6,412 in October, 1926.

The net income of the ferry company, as shown by exhibits made by its secretary, Brooks Shults, as reflected by its books, after paying interest on bonds, office expense of J. B. Shults, office expense of George T. Conway, the salaries allowed to J. B. Shults and George T. Conway, same being allowed in equal amounts until the beginning of this litigation, and the fees paid attorneys and expenses of the bridge litigation, is as follows:

For year ending May 31, 1923.....................$13,003.08
For year ending May 31, 1924.......................  7,684.61
For year ending May 31, 1925.......................  14,966.38
For year ending May 31, 1926.......................  28,430.84
For five months of the present fiscal
    year, a net income of...................................  14,407.32

W. J. Paulk, an expert accountant, after an examination of the books of the appellant company from its organization June 1, 1922, to November 1, 1926, made an exhibit of such audit, using the figures from the books of

gross income and actual expenditures, showing the earnings of the ferry for the fiscal years ending on May 31 were as follows.:

Year 1923................................................................$13,002.07
Year 1924................................................................ 11,184.61
Year 1925................................................................ 24,771.38
Year 1926................................................................ 35,685.42
Earnings for 5 months of 1927, the
    months of May to October, 1926,
    inclusive ........................................................ 14,686.76

Witness stated that $50 a month each for office expense had been paid to J. B. Shults and George T. Conway since May 31, 1923, and salaries of equal amount to these two, varying from year to year, except for the five months of the year ending May 31, 1927, when a salary at the rate of $500 a month was paid Shults and $250 a month to Conway. No capital account being carried, all items for renewals or additional equipment were being charged to expense account, the same as salaries paid employees. The supplies and equipment purchased and charged to this account during this period, with disbursements in dividends, salaries, bonds and interest, attorney's fees and cost of bridge litigation, all itemized, amounted to $122,904.25. •

This witness also made a schedule C, showing the estimated gross and net income of the appellant company at the reduced rate on automobiles, explaining his method of arriving at the gross income, and stated the rates put in effect by the county court would give one-half the present gross income. Leaving the expenses exactly as they are, except for a slight reduction for income taxes, with a reduction of gross income as above set forth, the net profit at the 35c rate would have been as follows :

For the fiscal year ending May 31, 1923........$ 4,012.77
For the fiscal year ending May 31, 1924........ 3,445.29
For the fiscal year ending May 31, 1925........ 7,249.42
For the fiscal year ending May 31, 1926........ 11,464.84
And after 5 months of the present fiscal
    year ................................................................ 7,335.76

Witness allowed no salaries to J. B. Shults and George T. Conway on this estimate, and to Brooks Shults, the bookkeeper, only the amount as shown on the books of the company, deducted other items charged to expense account, and made no allowance for amortization nor for liability insurance, casualty insurance, fire insurance or marine insurance, none being paid by the corporation.

Brooks Shults, secretary of the company, stated the method used by him in arriving at the gross amount that would be received at the 35c rates, and that it would have been, for the 5-months period, $14,472.85, an amount $712.67 less than the amount reached by Paulk, $15,185.52 under his estimate. Paulk claimed that Shults' method was wrong in that he multiplied the whole number of cars ferried by the 35c rate, when the number crossing at night paid 70c, the night rate, and that the number crossing at night should have been multiplied by 35c and added to the other amount.

The court held the rates fixed by the county court were reasonable, and from its judgment affirming the order of the county court this appeal is prosecuted.

*J. D. Head* and *Rose, Hemingway, Cantrell & Loughborough,* for appellant.

*Henry Moore, Jr.,* for appellee.

KIRBY, J., (after stating the facts). The rates of tolls for ferriage fixed by the Miller County Court are by this proceeding challenged as unreasonable and confiscatory, depriving appellant of its property without just compensation.

It appears that no rates of toll or ferriage whatever had been fixed by the county court after the organization of the appellant corporation and the taking over by it of the Shults ferry, operated across Red River at Fulton, the last rates fixed by the county court having been made in 1922. Under that schedule $1 was allowed to be charged as toll for ferriage of automobiles and $1 for trucks per ton. No complaint is made of any of the rates fixed in the present schedule except those relating to

automobiles and trucks, which are controlling and produce over 90 per cent. of the revenues of the ferry.

The county court is given authority, for the protection of the public, to fix the rates of tolls for ferries, and, while it is true that ferries are established for the accommodation of the public, rather than for the gain and advantage of persons operating them, it is also true that the rates fixed must be reasonable, and the question of the reasonableness of ferry rates is one solely for the courts. *State* v. *Arkadelphia Lumber Co.*, 70 Ark. 330, 67 S. W. 1011; *Kelly* v. *Altemus*, 34 Ark. 184, 36 Am. Rep. 6; *Ex Parte Grayson*, 169 Ark. 986, 277 S. W. 538; *Covington* v. *St. Francis County*, 77 Ark. 258, 91 S. W. 186.

The courts cannot interfere with the rates or tolls of ferries fixed by the county court unless same are unreasonable, and the burden is on the complaining party to show the unreasonableness of the rates attacked, the presumption being in favor of the reasonableness of such rates. *Arkadelphia Electric Light Co.* v. *Arkadelphia*, 99 Ark. 178, 137 S. W. 1093.

The value of the property devoted to the public use should be considered and determined as of the time when the inquiry is made regarding the rates. *Port Richmond & Bergen Point Ferry Co.* v. *Board of Chosen Freeholders of the County of Hudson*, 264 Fed. 998; *San Diego Land & Town Co.* v. *National City*, 174 U. S. 739, 19 S. Ct. 804, 14 L. Ed. 1154; *Smyth* v. *Ames*, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819; *Minnesota Rate Cases*, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. N. S. 1151, Ann. Cas. 1916A, 18.

"Past losses cannot be used to enhance the value of the property or to support a claim that rates for the future are confiscatory. * * * Profits of the past cannot be used to sustain confiscatory rates for the future." *Board of Public Utility Commrs.* v. *New York Telephone Co.*, 271 U. S. 23, 46 S. Ct. 363, 70 U. S. Law. ed. 808.

The value of the Fulton Ferry was fixed at $30,000 when a half interest therein was sold to the Conways for

$15,000, and that such was its reasonable value was recognized upon the organization of the appellant corporation taking it over for capitalization at that figure.

Appellant, in its argument here, uses this amount, although he does call it the "barebone value," and insists that a going concern value of $6,000 should be added, but it was a going concern when it was taken over and capitalized, has continued such ever since, and is better equipped now than then, after payment of all operating expenses, profits and dividends. It is true the secretary of the company puts the present value of the personal property of the corporation at $30,000, but it was returned by him for the year 1925 for taxation at only $4,000 and only paid taxes of $129.48 on all real and personal property in Arkansas for that year. The value of its personal property was placed at $15,000 by the secretary of the corporation, in its annual return for the year ending January 1, 1926, and on its return made to the Arkansas Railroad Commission the value of the personal property was reported as of January 1, 1926, at $6,000. An inventory and appraisement of its personal property was made by Crawford and McClure, witnesses for appellees, in October, 1926, placing the value at $6,412. Under all the circumstances, no such showing is made as warrants the consideration of an increased value as a going concern.

Neither was error committed in not allowing or considering any additional rental value of the ferry site owned by the corporation, as contended for. The value of the ferry site was evidently included in the capitalization of the corporation, as correctly indicated by the sale of a one-half interest in the Shults Ferry, a going concern, to the Conways, for the price of $15,000, and the organization of the appellant company taking it over for continued operation as its entire capital at a $30,000 valuation, recognized this to be true. This view is strengthened also by the testimony showing various official reports thereafter made by appellant corporation, placing the value of its personal property at one-half,

or even a lower sum than one-half, of the $30,000, and the other testimony relating thereto showing the cost of construction and reproduction.

Appellant's contention that the circuit court should have allowed or considered the cost of liability insurance as expense of operation is also without merit. No such insurance had been, was being or intended to be carried by it, and the undisputed testimony shows that, from the long experience of operation of all five ferries on Red River in Miller County, two of them for a period of more than forty years, no substantial damage had resulted or been incurred, and it cannot be said that an ordinarily prudent business man would be justified in incurring the great expense of this kind of insurance, in view of such experience. No great amount was claimed or estimated, and none allowed for fire insurance, which would ordinarily be considered a proper charge, but it is also true that no fire insurance had been carried and no fire losses had occurred during this period of operation.

Appellant should have been allowed the $6,000 yearly claimed, and the court should have considered the amount for amortization of the plant during the next three years only when it was shown the ferry would be displaced by the erection of a bridge.

The court should also have considered, in making allowance for necessary expenses of operation, a reasonable amount for "emergency work," as appellant calls it, required done in reconditioning "the shifting river bank" after overflows, for the road to the landing. This, notwithstanding no charge had theretofore been made against the company by J. B. Shults, its president, and manager of the ferry, for such work done by teams and men from his plantation hard by. Such work had been done, was necessary, and the testimony shows it will continue necessary to be done so long as the ferry is operated from "the shifting bank" of the overflowing river. We have concluded, however, that the testimony does not show such a probability now of suspension of travel over this State Highway road, the eastern approach to the

ferry, because of periodic extraordinary overflows of the river, since the roadbed has been raised and graveled, as warrants consideration of the allowance of any amount for loss of tolls or decreased income on that account.

The gross income from the ferry was shown for each of the years that it had been operated by the appellant corporation and the actual expenses of such operation. The gross receipts for the first five months of the fiscal year that will end May 31, 1927, June to October, 1926, are shown to be $31,013.69, and, as appellant puts it in its brief, "the receipts from the ferry are approximately $60,000 a year, collected in small change from each passenger, and the items of expense are disbursed in small amounts, requiring care and economy."

The net income, as shown by exhibits made by Brooks Shults, secretary, from appellant's books, by taking the actual expenses charged for operation by the company from the amount of the gross receipts, including, as such expenses, office expense each of J. B. Shults, president, and George T. Conway, vice president, salaries allowed to each of said parties, and the fees and expenses of attorneys in connection with the bridge litigation, was:

For the year ending May 31, 1923................$13,003.08

For the year ending May 31, 1926.................. 28,430.84

And five months of the present fiscal year...... 14,407.32

Paulk, an expert accountant, made an examination of the books of the appellant company from June, 1922, to November 1, 1926, and an exhibit of the result of such audit, showing the gross income and actual expenditures, the earnings for the fiscal year ending May 31, follows:

Year 1923 ...............................................$13,002.07

Year 1924 ................................. 35,685.42

For 5 months of 1927.............................. 14,686.76

His schedules showed also the profits made each year by the ferry company, after adding to the net profits, as shown by its books, the salaries and office expenses paid to J. B. Shults and George T. Conway and the interest

paid on bonds given for the bridge franchise, one-half to Conway and one-half to Shults, which, of course, greatly increased the showing of net earnings. There is little difference in the amounts shown as net profits for the five-month period in 1927 by the secretary of the company, $14,407.32, and by accountant Paulk, $14,686.76.

Paulk made schedules also showing the gross and net income of the appellant company for the years mentioned at the reduced rate of 35 cents for ferriage of automobiles, and for the five months of the fiscal year 1927, leaving the expenses exactly as charged, except a slight reduction for income taxes, which will be reduced as the income was reduced, showing that with such reductions of gross income the net profit at the 35c rate would have been as follows:

For the year 1923...............................................$ 4,012.77
For the year 1926............................................... 11,464.84
For the five months of the present
    fiscal year............................................. 7,335.76

In making these figures, however, he allowed no salaries for the officials and only $100 salary for Brooks Shults, the secretary and bookkeeper, as charged on the company's books.

The actual audit of total expenses as charged on the books for ferry operation by the secretary for the five months period (attorneys' fees and expense of bridge litigation not included) is $12,685.52; to this should be added, as above shown, the proportionate amount of the yearly allowance for amortization, $2,500, making in all $15,185.52. The estimated income at the 35c rates for the same period is $14,472.85, according to the secretary's calculation, not enough to pay the expenses as indicated. The income from the reduced rates as estimated by Paulk, one-half that produced by the old rates, is $15,506.84: $321.32 more than the expenses for this period, leaving only a negligible amount for a return on the value of the property used in rendering service to the public.

It can make no difference that the plant or ferry may have been entirely paid for out of excessive profits from

high rates in past years, since the law, in the protection of the owner in enjoyment of the property, does not consider the source from which the money came to purchase it, but only that it is used in rendering the service.

It is true the estimate of the independent accountant showed a substantial amount of earnings over expenses for the five-month period of operation at the 35c rate, but from it was excluded any charge for the salaries of officers, other items properly chargeable, and no allowance was made for amortization. There might well be excluded from the expense of operation the charge of any salary paid to the vice president, who had no real duties to perform relative to the operation of the ferry, but an additional allowance for compensation could be made to the secretary up to $250 a month, which would offset largely the allowance to the vice president, and not be unreasonable compensation to the secretary for the service rendered, as shown by the testimony. The salary as allowed to the president was begun to be charged and paid before this rate litigation developed, and, although it is large in comparison with the salary of other years, the testimony shows him to be an experienced and capable man, devoting virtually his entire time and attention to the management of the ferry, which has been so efficiently done that no damage to persons and property making use of the ferry has ever resulted during the long time of his supervision. Then, too, in other years it made no difference that the salary reflected by the books was not large, since ample compensation was realized by him out of profits and dividends.

From the testimony and estimates the circuit court should have found that day rates of toll of 50 cents for ferriage of automobiles and 50 cents for trucks (per ton), instead of the 35-cent rate made by the county court, with a night rate of 75 cents for automobiles and 75 cents per ton for trucks, instead of 70 cents, as fixed by the county court, would have been reasonable and yielded just compensation to the ferry company upon the value of its property used in rendering service to the

public. *Coal District Power Co.* v. *Booneville,* 161 Ark. 638, 256 S. W. 871.

The said rates as fixed by the county court are shown to have been unreasonable, and the circuit court erred in holding otherwise and in not finding and fixing the rates designated above, which will afford a fair and just return upon the investment as reasonable, for which errors its judgment will be reversed, and the cause remanded with directions to reverse and overrule the judgment and order of the county court fixing said unreasonable rates, and adjudge and fix the said rates as reasonable, and have certified its judgment to that court for establishment of the said rates herein designated as reasonable rates of toll for the ferriage of automobiles and trucks at the Fulton Ferry operated by appellant.

It is so ordered.